## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **FIRST STATE INSURANCE COMPANY,** | |
| Plaintiff & Counterclaim-Defendant, | |
| **v.** | |
| **XTRA Intermodal, Inc.; X-L-Co., Inc.; XTRA LLC; & XTRA Corporation,** | **Case No. 3:22-CV-216-NJR** |
| Defendants, Crossclaim Defendants, Counterclaim Plaintiffs, & Crossclaim Plaintiffs, | |
| **Associated Indemnity Company; Fireman's Fund Insurance Company, & American Insurance Company,** | |
| Defendants, Crossclaim Defendants, Counterclaim Plaintiffs, & Crossclaim Plaintiffs. | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Pending before the Court are two choice of law motions: (1) First State Insurance Company, Associated Indemnity Company, Fireman's Fund Insurance Company, and American Insurance Company's (collectively "Insurers") Joint Motion on Choice of Law (Doc. 125); and (2) XTRA Intermodal, Inc., XTRA LLC, X-L-Co., Inc., and XTRA Corporation's (collectively "XTRA Entities") Motion on Choice of Law (Doc. 127). The Insurers contend that the substantive law of Massachusetts governs this coverage dispute, whereas the XTRA Entities argue that Illinois law applies.

The parties have submitted a stipulation establishing certain facts and the authenticity of certain documents for use in connection with their respective motions (the "Stipulation").

(Doc. 124). The Stipulation "constitutes a final and binding determination of the facts set forth in the Stipulation" to the extent that a Party so stipulated. *Id.* at 2. The Court has carefully reviewed the briefs, the Stipulation, and the supporting exhibits. For the following reasons, the Court concludes that Illinois law governs this dispute.

BACKGROUND

1. <u>The Parties</u>

XTRA Corporation ("XTRA Corp.") is incorporated in Delaware and its current principal place of business is in St. Louis, Missouri. (Doc. 125-3 at 3). From 1977 until 1987, XTRA Corp.'s "management offices," which served "administrative" and non-customer-facing functions, were located in Boston, Massachusetts. (Doc. 125-3 at 3; Doc. 125-2 at 18). During that time, however, XTRA Corp.'s "principal executive offices" were located in Delaware. (Doc. 125-3 at 3; Doc. 125-2 at 17). XTRA, Inc. is a Massachusetts corporation that merged into XTRA Corp. in December 1976. (Doc. 124 at ¶ 27). After this merger, XTRA, Inc. was dissolved. (Doc. 125-2 at 15). X-L-Co., Inc. ("X-L-Co.") is incorporated in Delaware and, until 1999, it maintained its principal place of business in Massachusetts. (Doc. 125-3 at 4). Today, X-L-Co.'s corporate records, officers, and directors are located in the St. Louis, Missouri area. *Id.* XTRA Intermodal, Inc. ("XTRA Intermodal") is incorporated in Delaware and its principal place of business is in Missouri. *Id.* XTRA LLC is a Maine limited liability company whose sole member is XTRA Companies, Inc.,[1] a Delaware corporation with its principal place of business in Missouri. (Doc. 125-7 at 3).

American Insurance Company ("American Insurance") is incorporated in Ohio.

---

[1] XTRA Companies, Inc. is not a party to this case.

(Doc. 124 at ¶ 80). Associated Indemnity Company ("Associated Indemnity") is incorporated in California. *Id.* at ¶ 81. The principal place of business for both American Insurance and Associated Indemnity is in California. Fireman's Fund Insurance Company ("FFIC") is incorporated in California, and between 1976 and January 2022, its principal place of business was also in California. *Id.* at ¶¶ 79, 84. FFIC acquired Associated Indemnity and American Insurance in 1963 (FFIC, Associated Indemnity, and American Insurance are thus referred to as the "Primary Insurers" and the insurance policies they issued to the XTRA Entities are referred to as the "FFIC Policies"). *Id.* at ¶ 82. Between 1978 and 1985, Associated Indemnity issued five primary insurance policies to one or more of the XTRA Entities. (Doc. 124 at ¶ 52; Doc. 125 at 5). During that same period, American Insurance issued 13 commercial insurance policies to one or more of the XTRA Entities. (Doc. 124 at ¶ 58; Doc. 126-1 at 22-56).

First State Insurance Company ("First State") is incorporated and maintains its principal place of business in Connecticut. (Doc. 7-1 at ¶ 5). First State issued eight excess insurance policies to XTRA Corp. between 1977 and 1983. (Doc. 124 at ¶ 102; Doc. 125 at 4). During that time, First State had no employees, and its affiliate, Cameron and Colby Company, Inc. ("Cameron and Colby"), served as its managing general agent, underwriting insurance policies on First State's behalf. (Doc. 124 ¶¶ 97, 99). Cameron and Colby was headquartered in Boston, Massachusetts, although it had operations throughout the country, including in Illinois. *Id.* ¶ 98. The eight First State insurance policies at issue here were issued to XTRA Corp. or its predecessor by merger, XTRA, Inc. *Id.* ¶ 102. The goal of these policies was to procure insurance coverage "for XTRA Corporation and all its subsidiaries nationwide." (Doc. 125-2 at 19).

2. <u>Factual Background</u>

This litigation concerns significant environmental pollution at the Old American Zinc Superfund Site in Fairmont City and Washington Park, in St. Clair and Madison Counties, Illinois ("OAZ Superfund Site"). (Doc. 124 at ¶ 1). The OAZ Superfund Site embraces a 132-acre facility area where zinc smelting operations were historically conducted ("OAZ Facility Area"), as well as surrounding areas. *Id.* at ¶ 2. In September 1976, X-L-Co. leased parts of the OAZ Facility Area from American Zinc Company ("American Zinc") for use as a trucking terminal. *Id.* at ¶ 4; *United States v. XTRA Intermodal, Inc.*, 3:21-cv-00339-NJR (Doc. 1 at ¶ 33) (hereinafter "EPA Complaint"). In 1979, X-L-Co. purchased the full OAZ Facility Area from American Zinc to expand its trucking operations. (Doc. 124 at ¶ 6; EPA Complaint at ¶¶ 35, 37). In 1995, X-L-Co. conveyed the OAZ Facility Area to XTRA Intermodal, Inc. (Doc. 124 at ¶ 9).

Over the years, the OAZ Facility Area's operations led to the release of hazardous substances, including lead, cadmium, zinc, arsenic, and manganese into the surface and groundwater of the OAZ Superfund Site. (EPA Complaint at ¶ 4). These operations also generated a byproduct known as "slag," which was poured along the boundaries of the OAZ Facility Area in a molten state and left to cool over time. (Doc. 124 at ¶¶ 74, 75). The resulting slag piles "encompassed more than 15 acres over the western and northern boundaries of the OAZ Facility Area." *Id.* at ¶ 75. Today, residential, commercial, and public properties are located within the OAZ Superfund Site, along with "drainage ways that receive drainage from the OAZ Facility Area[,] and shallow groundwater within and immediately adjacent to the OAZ Facility Area." *Id.* ¶ 2.

PROCEDURAL HISTORY

In 2013, Blue Tee Corp. ("Blue Tee"), the successor to American Zinc, sued the XTRA Entities in this Court seeking contribution for costs associated with the remediation of the OAZ Superfund Site ("the Blue Tee Lawsuit"). (*See Blue Tee Corp. v. XTRA Intermodal, Inc.*, 3:13-cv-830-DRH; Doc. 125-5). The Blue Tee Lawsuit was dismissed at the request of all parties in January 2020 after Blue Tee reached a settlement with state and federal regulators. (Doc. 125-6; Doc. 125-7 at 4).

On March 30, 2021, the United States, on behalf of the Environmental Protection Agency ("EPA"), and the State of Illinois, on behalf of the Illinois Department of Natural Resources (collectively the "Government"), filed a complaint against X-L-Co. and XTRA Intermodal in this Court pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). (Doc. 124 at ¶ 18; *see also* (EPA Complaint at ¶ 1)). The EPA Complaint alleged that the zinc smelting operations in the OAZ Facility Area had caused serious damage to the environment at the OAZ Superfund site, which required extensive and ongoing remediation. *Id.* at ¶¶ 1, 19, 20. The Government sought injunctive relief and reimbursement of costs from XTRA Intermodal and X-L-Co. for the response to the release or threatened release of hazardous substances at the OAZ Superfund Site. *Id.* at ¶ 1. Responsive actions included the excavation of contaminated soils in and around the OAZ Facility Area and capping of consolidated excavated soil under a thick barrier layer. *Id.* at ¶14. The EPA estimated that the total cost of remediation was between $90 million and $100 million, which included over $44 million in direct future remediation costs. (Doc. 124 at ¶ 20). In June 2021, a consent decree was entered in the Government's lawsuit against X-L-Co. and XTRA Intermodal, pursuant to which, X-L-Co.

and XTRA Intermodal were held liable for response costs and environmental damage in the amount of approximately $41 million. *United States v. XTRA Intermodal, Inc.*, 3:21-cv-00339-NJR (Doc. 13-1 at 7).

The Blue Tee Lawsuit and the Government's lawsuit against X-L-Co. and XTRA Intermodal gave rise to two separate lawsuits in Massachusetts. The first lawsuit was filed in the United States District Court for the District of Massachusetts in 2014 by Federal Insurance Company ("Federal"), one of the XTRA Entities' primary insurance providers, against the XTRA Entities and several of their other primary insurance providers (the "Primary Coverage Litigation").[2] (Doc. 125-8 at 4). The Primary Coverage Litigation concerned various primary insurance providers' respective obligations to defend and indemnify the XTRA Entities in the Blue Tee Lawsuit. (Doc. 47 at 2-3). On July 15, 2015, the District of Massachusetts transferred the Primary Coverage Litigation to this district pursuant to 28 U.S.C. § 1404(a). (Doc. 125-8 at 19). After the venue transfer, the Primary Coverage Litigation was stayed pending the outcome of the Blue Tee Lawsuit. (Doc. 125-7 at 5).

The second lawsuit, originally filed by First State against the XTRA Entities in the Suffolk County Superior Court in Massachusetts in October 2021, forms the basis of this action (the "Excess Coverage Litigation"). *Id.* The Excess Coverage Litigation was removed to federal court in Massachusetts and similarly transferred to this Court on February 3, 2022. (Doc. 125-7 at 18). With both the Primary Coverage Litigation and the Excess Coverage Litigation now in this Court, the XTRA Entities filed a motion to join the Primary Insurers as Defendants in this action under Federal Rules of Civil Procedure 19(a) and 21. (Doc. 47). The

---

[2] The Primary Coverage Litigation was docketed in this Court as *Federal Insurance Company v. XTRA Intermodal, Inc. et al.*, 3:15-cv-00766-NJR.

Court granted the XTRA Entities' motion for joinder on March 23, 2022. (Doc. 48). With all

parties properly joined, they proceeded to litigate the choice of law issue addressed in this

Order.[3]

## DISCUSSION

The critical issue at this stage of the litigation is whether the substantive law of

Massachusetts or Illinois governs the interpretation of the insurance policies at issue. Because

this case originated in the United States District Court for the District of Massachusetts, the

---

[3] The XTRA Entities removed this case to federal court on the basis of diversity of citizenship under 28 U.S.C. § 1332(a). (Doc. 7-8). Federal courts have original jurisdiction over all actions between "citizens of different States" where the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a). To proceed on this jurisdictional basis, the Court must satisfy itself that complete diversity of citizenship exists and that the amount in controversy requirement is satisfied. *City of E. St. Louis, Illinois v. Netflix, Inc.*, 83 F.4th 1066, 1070 (7th Cir. 2023); *Webb v. FINRA*, 889 F.3d 853, 856 (7th Cir. 2018). "Complete diversity exists only if none of the defendants has the same citizenship as any plaintiff." *City of E. St. Louis*, 83 F.4th at 1070. Complete diversity exists here because none of the parties is a citizen of the same state as any party opponent. *See Page v. Democratic Nat'l Comm.*, 2 F.4th 630, 636 (7th Cir. 2021). The parties are corporate entities whose citizenship for diversity purposes is determined by their state of incorporation and their principal place of business. 28 U.S.C. § 1332(c)(1). At the time of removal, First State was incorporated and maintained its principal place of business in Connecticut (Doc. 7 at 4); Associated Indemnity and FFIC were incorporated and maintained their respective principal places of business in California (Doc. 124 at ¶¶ 79, 81; *Federal Insurance Company v. XTRA Intermodal, Inc. et al.*, 3:15-cv-00766-NJR (Doc. 6 at ¶¶ 10, 11)); American Insurance was incorporated in Ohio and maintained its principal place of business in California (Doc. 124 at ¶ 80; *Federal Insurance Company v. XTRA Intermodal, Inc. et al.*, 3:15-cv-00766-NJR, (Doc. 6 at ¶ 8)). Thus, at the time of removal, the Insurers were citizens of Connecticut, California, and Ohio. XTRA Corp., XTRA Intermodal, and X-L-Co. were incorporated in Delaware and maintained their respective principal places of business in Missouri, thus making them citizens of those states. (Doc. 47 at 7). As a limited liability company, XTRA LLC's citizenship is determined by the citizenship of its members. *Page*, 2 F.4th at 635. XTRA LLC's sole member is XTRA Companies, Inc., a Delaware corporation with its principal place of business in Missouri. (Doc. 125-7 at 3). Thus, XTRA LLC was a citizen of Delaware and Missouri. *See City of E. St. Louis*, 83 F.4th at 1070 (a limited liability company's citizenship must be "traced through as many levels as necessary until reaching a natural person or a corporation."). The Court notes that the Stipulation identifies First State's state of incorporation as Delaware. (Doc. 124 at ¶ 96). This would have presented a problem for complete diversity because the XTRA Entities are also incorporated in Delaware. Upon closer inspection, however, the Court concludes this part of the stipulation is an error, as the complaint and notice of removal both allege that First State is a Connecticut corporation with its principal place of business in Connecticut (Doc. 7 at ¶ 15; Doc. 7-1 at ¶ 5). Moreover, First State is identified as a "domestic" corporation whose "place of formation" is Connecticut in the State of Connecticut's official business entity database. *See:* https://service.ct.gov/business/s/onlinebusinesssearch?businessNameEn=cKo1q417Bz9Wo06uUEEOYFu3WboPduR3625uRZ%2BScmz5k1P1PBCS9aO%2Bz0vcn8Pv (last visited Mar. 29, 2024).

The amount in controversy is easily met in this case as the complaint properly alleges that X-L-Co. and XTRA Intermodal confessed to an entry of judgment over $41 million. (Doc. 7-1 at ¶ 39). *See Sykes v. Cook Inc.*, 72 F.4th 195, 205 (7th Cir. 2023) (amount in controversy standard is "not onerous," and courts will find that they have jurisdiction "unless an award for the jurisdictional minimum would be legally impossible.").

choice of law rules of Massachusetts will resolve this question.[4]

### 1. Whether a Conflict of Law Exists

The first step in the analysis is to determine whether a conflict of law even exists between the laws of Illinois and Massachusetts. *Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 4 (1st Cir. 2004) (applying Massachusetts choice of law rules).

Most of the insurance policies at issue here contain a coverage exclusion for environmental pollution, unless the discharge causing the pollution was "sudden and accidental." The language of the exclusion reads as follows:

> It is agreed that the Insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants, into or upon land, the atmosphere or any watercourse or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

(Doc. 125-11 at 10) (emphasis added). In short, the policies exclude coverage for liabilities arising out of toxic releases, but coverage is retriggered if the release was "sudden and accidental." These types of exclusion provisions are a common feature of comprehensive general liability policies, as they protect insurers from claims for "pollution-related damage which should reasonably have been foreseen." *Millipore Corp. v. Travelers Indem. Co.*, 115 F.3d 21, 24 (1st Cir. 1997). A critical issue in this case is whether the "sudden and accidental"

---

[4] Ordinarily, federal courts sitting in diversity apply the choice of law rules of their forum state. *Agfa-Gevaert, A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1525 (7th Cir. 1989). For this Court, that would mean that Illinois' choice of law rules apply. But because this case reaches this Court by way of a venue transfer under 28 U.S.C. § 1404, the Court is obligated to apply the choice of law rules that would have applied in the transferor court, namely the United States District Court for the District of Massachusetts. *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) (change of venue does not affect choice of law analysis because "[a] change of venue under [§] 1404(a) generally should be, with respect to state law, but a change of courtrooms."); *accord Ferens v. John Deere Co.*, 494 U.S. 516, 526 (1990).

exception to the coverage exclusion applies to retrigger coverage for the XTRA Entities.[5] Thus, if Massachusetts and Illinois inconsistently interpret the scope of the "sudden and accidental" exception, then a conflict of law exists.

In *Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc.* ("*Belleville*"), the Supreme Judicial Court of Massachusetts (at times referred to as the "SJC") held that the word "sudden" in conjunction with the word "accidental" incorporated a "temporal element." 555 N.E.2d 568, 572 (Mass. 1990). This means that "[i]f the release was abrupt and also accidental, there is coverage for an occurrence arising out of the discharge of pollutants." *Id.* Conversely, if the release of toxins was "gradual," then the exclusion exception would not apply to retrigger coverage.[6] *Id.* "[T]he abruptness of the commencement of the release or discharge of the pollutant," the SJC explained, "is the crucial element" in determining whether insurance coverage is available. *Id.*

Illinois has rejected this approach. In *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, the Illinois Supreme Court interpreted the term "sudden" to mean "unexpected or unintended." 607 N.E.2d 1204, 1218 (Ill. 1992). The *Outboard* court cited and expressly repudiated *Belleville*'s interpretation of the word "sudden" because, in its view, "unexpected or unintended releases . . . are exactly the type of uncertainties or risks that an insured would want to insure against," regardless of the abruptness of the pollution. *Id.* at 1219. Thus, Illinois focuses on the

---

[5] The Court takes no position at this time on the ultimate question of whether there is coverage under pollution exclusion provision.

[6] *Belleville* reached the SJC by way of a certified question of law from a federal district court. *Id.* at 570. This procedural posture is important because the court was forced to offer its interpretation of the "sudden and accidental" exclusion exception without the benefit of a fully developed factual record. *See id.* at 572, 573 (recognizing that "[t]he facts concerning the discharge of pollutants by [the insured] have not been certified to us" and that the court consequently "d[id] not know enough about what the pollution was, and when and how the release or discharge started, to say anything further.").

foreseeability of the pollution-causing event to determine whether the exclusion exception applies, not on its temporal characteristics.

It follows that Illinois interprets the exclusion exception more broadly than Massachusetts, meaning that coverage may apply in situations under Illinois law where it would not apply under Massachusetts law. *C.f. Millipore*, 115 F.3d at 30 (citing *Belleville* and noting Massachusetts' "expansive[]" interpretation of pollution exclusion provision). For this reason, a conflict exists between Massachusetts and Illinois law in the interpretation of the exclusion exception at issue here. This requires the Court to consult Massachusetts' choice of law rules to determine whether Massachusetts or Illinois substantive law applies.

### 2. Whether Massachusetts or Illinois Law Applies

The Supreme Judicial Court of Massachusetts has adopted a "functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Associates, Inc. v. Raytheon Co.*, 473 N.E.2d 662, 668 (Mass. 1985). This "flexible interest-based" approach seeks to accommodate a wide range of scenarios and interests that may be relevant in choosing the applicable law. *Millipore*, 115 F.3d at 30. The goal is to produce "fair result[s]" based on the individualized considerations of each case, rather than rigidly adhering to "artificial constructions" that fail to address the facts and circumstances presented. *Bushkin*, 473 N.E.2d at 668.

In addition to providing flexibility, Massachusetts' choice of law rules seek to promote predictability and consistency. This is particularly true in cases like this one, where insurance policies cover risks across multiple states. Under Massachusetts law, this means that "one jurisdiction's rules of decision must be applied to all of the sites." *Millipore*, 115 F.3d at 31. This principle promotes the "desirable" result of "uniform and practical coverage nationwide

for a multistate corporation." *W.R. Grace & Co. v. Hartford Acc. and Indem. Co.*, 555 N.E.2d 214, 221 (Mass. 1990). After all, "the expectations of the parties as well as commercial realities require that the language in a single set of insurance policies should mean the same thing in every state." *Millipore*, 115 F.3d at 30-31.

Massachusetts has adopted the considerations of the Restatement (Second) Conflict of Laws to inform a choice of law analysis. *Bushkin*, 473 N.E.2d at 670. Three Restatement provisions are pertinent to this inquiry: Sections 193, 188, and 6. Section 193 offers choice of law principles that specifically address disputes concerning insurance contracts; Section 188 provides guidance for choice of law analyses concerning contracts generally; and Section 6 offers general choice of law principles that apply, regardless of the nature of the dispute. These provisions are considered sequentially: "[T]he first step is to ascertain whether the provisions of § 193 will resolve the matter; if not, the next step is to employ the principles set forth in § 188 to ascertain which State has a more significant relationship to the issues, using in that analysis the factors set forth in § 6." *Clarendon Nat. Ins. Co. v. Arbella Mut. Ins. Co.*, 803 N.E.2d 750, 752-53 (Mass. App. Ct. 2004). The Court will follow this roadmap from *Clarendon* in its choice of law analysis.

### a.   Restatement Section 193

Section 193 provides that "[t]he validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6." "The location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law

provided that the risk can be located, at least principally, in a single state." Restatement (Second) of Conflict of Laws § 193, cmt. b. Although this principle lends itself to a straightforward application in the context of an insurance policy that covers a single risk—such as a home or a car—it does not conclusively resolve the issue presented here because the policies broadly cover risks across jurisdictions in the United States and Canada. As a result, no single state can be identified as the principal location of the insured risk. At most, one could say that Massachusetts would have a slightly more significant contact to the insurance policies here because X-L-Co., one of the named insureds and the original lessee of the OAZ Facility Area, maintained its principal place of business in Massachusetts during the relevant policy periods. Comment b to Section 193 recognizes that the state of the insured's domicile may inform the search for the principal location of the insured risk because "[i]n the normal case, . . . the policy will have been solicited and delivered and the last act necessary to make the contract binding will have taken place in the state where the insured is domiciled or incorporated, and where the insured risk is located." *Id.* Accordingly, this consideration favors Massachusetts as it served as the domicile for one of the insureds. *See Gen. Elec. Co. v. E.W. Lines*, 2008 WL 2908053, at *2 (Mass. Super. 2008) (Gants, J.)[7] ("[G]enerally, the insured risk will be located in the state where the policyholder is domiciled.").

But this rather tenuous connection to Massachusetts does not resolve the inquiry under Section 193, much less the ultimate choice of law issue. Indeed, comment f to Section 193 addresses the "special problem" that arises in situations where multiple policies cover

---

[7] The author of this opinion, Judge Ralph D. Gants, later joined the Supreme Judicial Court of Massachusetts and served as its Chief Justice from 2014 to 2020.

risks in various states, the exact scenario presented here. The Restatement offered the following observation:

> A single policy may, for example, insure dwelling houses located in states X, Y and Z. These states may require that any fire insurance policy on buildings situated within their territory shall be in a special statutory form. If so, the single policy will usually incorporate the special statutory forms of the several states involved. Presumably, the courts would be inclined to treat such a case, at least with respect to most issues, as if it involved three policies, each insuring an individual risk. So, if the house located in state X were damaged by fire, it is thought that the court would determine the rights and obligations of the parties under the policy, at least with respect to most issues, in accordance with the local law of X.

*Id.*, cmt. f. The takeaway from this comment is that the location of an affected property plays an important role in determining the applicable law for an insurance policy that implicates various states. Here, that state would be Illinois, where the OAZ Superfund Site is located. *See A. Johnson & Co., Inc. v. Aetna Cas. and Sur. Co.*, 741 F. Supp. 298, 301 (D. Mass. 1990) ("The basic policies underlying the developing law of environmental remedy strongly support making the site of the alleged damage the governing jurisdiction for choice of law purposes."); *but see W.R. Grace & Co. v. Maryland Ins. Co.*, 600 N.E.2d 176, 179 (Mass. App. Ct. 1992) (applying substantive law of New York to coverage dispute even though underlying claim was located in Massachusetts). But there is more to this consideration than simply identifying the OAZ Superfund Site as the location that generated a claim. The record reveals that the five primary insurance policies issued by Associated Indemnity identified notably more risk locations in Illinois than in Massachusetts. (Doc. 127-13 at 43-45; Doc. 127-14 at 25-27; Doc. 127-15 at 29-32; Doc. 127-16 at 11-14; Doc. 127-17 at 9-12). It seems illogical to identify Massachusetts as the "principal location of the insured risk" when the primary insurance policies covered more locations in Illinois as well as other states. Accordingly, this

consideration under Section 193 would appear to favor the application of Illinois law.

The Court concludes that the considerations of Section 193, which seek to identify the "principal location of the insured risk," are in equipoise and do not resolve the issue of which state's law should apply. Thus, the Court will move on to consider the principles set forth in Sections 188 and 6 of the Restatement to determine whether Illinois or Massachusetts law should govern this coverage dispute.

b.   Restatement Section 188

Section 188 provides that "[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." Restatement (Second) of Conflict of Laws § 188(1). Moreover, "the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* at § 188(2). The SJC has cautioned that it "do[es] not view the process, intended under § 188, for determining the State with the most significant relationship to the issue as simply adding up various contacts." *Bushkin*, 473 N.E.2d at 669.

Here, although Massachusetts has some contacts to the relevant policies under Section 188, the Court is not persuaded that it has "the most significant relationship" to the parties and the transactions at issue. Restatement (Second) of Conflict of Laws § 188(1). The record does not reveal the place of contracting. It is true that the First State Policies were issued to either XTRA, Inc. or XTRA Corp. at a Massachusetts address. But XTRA, Inc. merged into

XTRA Corp. and was dissolved in December 1976, just three months after X-L-Co. leased parts of the OAZ Facility Area from American Zinc, and three months *before* First State even began providing insurance coverage to the XTRA Entities. (Doc. 124 at ¶ 97). The record also shows that XTRA Corp. is incorporated and maintained its "principal executive offices" in Delaware, not Massachusetts, which refutes the contention that Massachusetts was the place of contracting. *See Hertz Corp. v. Friend*, 559 U.S. 77, 80 (2010) (a corporation's principal place of business is "the place where [its] high level officers direct, control, and coordinate [its] activities."). Thus, although the First State Policies list a Massachusetts address as the location of the insured, this alone does not establish Massachusetts as the place of contracting because that insured's principal place of business was not in Massachusetts. Moreover, three of Associated Indemnity's policies list addresses in Missouri for XTRA Corp., which further attenuates Massachusetts as the location of contracting. (Doc. 127-15 at 5; Doc. 127-16 at 2; Doc. 127-17 at 3). Accordingly, this factor does not support Massachusetts as the place of contracting, and even if it did, the Restatement counsels that "[s]tanding alone, the place of contracting is a relatively insignificant contact." Restatement (Second) of Conflict of Laws § 188, cmt. e.

The place of negotiation appears to have been Massachusetts. Cameron & Colby, First State's affiliate and managing general agent, was headquartered in Boston and issued the Frist State Policies to either XTRA, Inc. or XTRA Corp. in Boston. Moreover, the XTRA Entities relied on Frederick E. Penn Insurance Agency, based in Needham, Massachusetts, to broker the FFIC Policies. (Doc. 127-13 at 4). The third and fourth factors under Section 188, the place of performance and the location of the subject matter of the contract, do not conclusively establish Illinois or Massachusetts as the state with a more compelling contact,

although the FFIC Policies identify considerably more insured locations in Illinois than in Massachusetts. (Doc. 127-13 at 43-45; Doc. 127-14 at 25-27; Doc. 127-15 at 29-32; Doc. 127-16 at 11-14; Doc. 127-17 at 9-12). As previously noted, the policies covered risks across the United States and Canada, which undermines any contention that either Massachusetts or Illinois had a more significant contact to the parties or the transactions at issue. *See Lines*, 2008 WL 2908053, at *2 ("The liability policy was nationwide in scope so it is impossible to identify any single state as the place of performance or the location of the subject matter of the contract."). And finally, the consideration of the parties' respective domiciles, places of incorporation, and places of business implicates several states, including but certainly not limited to Massachusetts. During the relevant policy periods, X-L-Co. had its principal place of business in Massachusetts, as did First State, through its relationship with Cameron & Colby. But XTRA Corp. and XTRA Intermodal are incorporated in Delaware, XTRA LLC is a Maine limited liability company, and none of these three entities have their principal place of business in Massachusetts. Moreover, Associated Indemnity and American Insurance are incorporated in California and Ohio respectively, and both are corporate subsidiaries of FFIC, a California corporation. Accordingly, this factor does not help identify a state with particularly compelling contacts to the parties and the transactions at issue.

### c.   Restatement Section 6

Having determined that neither Section 193 nor Section 188 of the Restatement (Second) Conflict of Laws resolves the question of whether Illinois or Massachusetts law should be applied to resolve this dispute, the Court proceeds to analyze the "choice-influencing factors listed in § 6(2)." *Bushkin*, 473 N.E.2d at 670. Section 6 offers the following seven considerations to inform the choice of law analysis: "(a) the needs of the interstate and

international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." *Id.* at 6(2). Massachusetts applies these considerations to identify "the State with the most significant relationship to the transaction and the parties *with respect to the issue* that presents the conflict of laws." *Comerica Bank & Trust, N.A. v. Brown & Rosen, LLC*, 195 N.E.3d 432, 437 (Mass. App. Ct. 2022) (cleaned up, emphasis added). Here, the disputed issue is the interpretation of the "sudden and accidental" exclusion exception. Accordingly, the Court must determine whether Illinois or Massachusetts has the most significant relationship to this issue. *Id.* at 437-38. The first four Section 6 factors mentioned above are particularly probative for the resolution of this choice of law dispute.

### i. The needs of the interstate and international systems

This factor seeks to promote "harmonious relations between states and to facilitate commercial intercourse between them." Restatement (Second) of Conflict of Laws § 6, cmt. d. To that end, "[i]n formulating rules of choice of law, a state should have regard for the needs and policies of other states and of the community of states." *Id.* Here, the Court would anticipate that Massachusetts courts would be sensitive to the local needs of Illinois and the extensive remedial work that has been needed within its borders. This type of judicial comity is particularly appropriate in cases involving environmental pollutions in one state that do not affect the forum. *See A. Johnson*, 741 F. Supp. at 301 (under Massachusetts choice of law rules, the state where the environmental pollution is located "has the single most important

connection to the core issues of the case."). Indeed, in addressing the needs of the interstate system in a choice of law analysis, the SJC has recognized that "[d]eference to sister state law in situations in which the sister state's substantial contacts with a problem give it a real interest in having its law applied will at times usefully further this part of the law's total task." *Cosme v. Whitin Mach. Works, Inc.*, 632 N.E.2d 832, 836 (Mass. 1994) (internal quotation marks and ellipsis omitted). There can be little doubt that Illinois has a substantial interest in the environmental pollution at the OAZ Superfund Site. This interest must be balanced against Massachusetts' interest in certain insurance policies involving *some* parties who had their principal place of business in Massachusetts during the late 1970s and early 1980s, and others who had no such connection to the Commonwealth. Against this backdrop, the Court is not persuaded that the needs of the interstate system are better served by the application of Massachusetts law to this coverage dispute. Rather, it is apparent that the needs of the interstate system favor the application of Illinois law.

### ii. The relevant policies of the forum

The Court is aware of no Massachusetts policy that compels or even supports the application of its law to the interpretation of the "sudden and accidental" exclusion exception in this case. Surely, in adopting its interpretation of this exception in *Belleville*, the Supreme Judicial Court expressed its policy preference on behalf of the Commonwealth of Massachusetts that insurance companies should be protected from claims for "pollution-related damage which should reasonably have been foreseen." *Millipore*, 115 F.3d at 24.

But it is doubtful that the Supreme Judicial Court expected this interpretation to have the type of extraterritorial effect that the Insurers press here. Indeed, on this exact point, the Restatement observes that courts are "under no compulsion to apply the statute or rule to

such out-of-state facts since the originating legislature or court had no ascertainable intentions on the subject." Restatement (Second) of Conflict of Laws § 6, cmt e. Of course, this is not to say that *Belleville* would never apply outside of the borders of Massachusetts. Certainly, if the parties to an insurance policy choose Massachusetts law to govern the policy, or if the contacts to Massachusetts are sufficiently compelling to warrant the application of Massachusetts law, then *Belleville* could displace another state's interpretation of the "sudden and accidental" exclusion exception. But here, the parties have not identified, nor is the Court aware of any Massachusetts policy that supports the displacement of Illinois law under the circumstances of this case. Thus, this factor does not weigh in either Massachusetts' or Illinois' favor.

   iii.   *The relevant policies of other interested states and the relative interests of those states in the determination of the particular issue*

As the state confronted with a major environmental pollution within its borders, Illinois can fairly be considered a state whose interest should be considered and weighed relative to those of Massachusetts in this choice of law analysis. It is, of course, not surprising that Illinois' public policy seeks to protect the state's environmental resources for present and future generations. Indeed, the Illinois Constitution expressly provides that "[t]he public policy of the State and the duty of each person is to provide and maintain a healthful environment for the benefit of this and future generations." Ill. Const. of 1970, art. XI, § 1. Moreover, Section 2 of Article 11 states that "[e]ach person has the right to a healthful environment." Ill. Const. of 1970, art. XI, § 2. These broad public policy objectives are certainly implicated by an environmental pollution in Illinois. Historical operations at the OAZ Facility Area have caused lead, cadmium, zinc, arsenic, and manganese to spread to the soils,

sediments, and groundwater. To this day, residential and commercial areas address drainage from the OAZ Facility Area, and the EPA expects responsive actions to be needed well into the future. Illinois' interest in the remediation of this pollution can hardly be overstated, and this interest carries significant weight in a choice of law analysis, because "it is fitting that the state whose interests are most deeply affected should have its local law applied." Restatement (Second) of Conflict of Laws § 6, cmt. f.; *see also Comerica*, 195 N.E.3d at 437 (selecting Massachusetts law based on its more compelling regulatory interest in the matter even though some interested parties were domiciled in Minnesota and related settlement agreement was negotiated and executed in Minnesota).

But notwithstanding Illinois' rather obvious interest in the remediation of the OAZ Superfund Site, the Court recognizes that the issue in this litigation is not *if* environmental remediation will take place, but rather, who will be responsible for paying for it. For that reason, the outcome of this choice of law analysis is unlikely to defeat Illinois' public policy objective of environmental protection. As a result, the Court finds that the relevant policies of other interested states do not favor the application of either Massachusetts or Illinois law.

### iv.   *The protection of justified expectations*

Massachusetts courts attribute significant weight to the protection of justified expectations in a choice of law analysis. In *Bushkin*, the SJC explained that "[w]here relevant contacts and considerations are balanced, or nearly so, we are inclined to resolve the choice by choosing that law which would carry out and validate the transaction in accordance with intention, in preference to a law that would tend to defeat it." 473 N.E.2d at 671 (internal quotation marks omitted). Although it is difficult, if not impossible, to accurately pinpoint the parties' justified expectations more than 40 years after the fact, a review of the evolution

of the "sudden and accidental" exclusion exception in Massachusetts offers important context to the parties' justified expectations at the time of contracting.

In *New England Gas & Elec. Ass'n v. Ocean Acc. & Guarantee Corp.*, the SJC engaged a "sudden and accidental" coverage modification for the first time. 116 N.E.2d 671 (Mass. 1953). There, the insured, a producer and distributor of electricity, sought coverage for damage to a turbine spindle, which required the turbine to be completely shut down. *Id.* at 675. The spindle had been subjected to increased stress because the turbine's condenser springs had been improperly installed approximately eleven months before the damage to the spindle was discovered. *Id.* at 678. The insurance policy in question provided coverage for "a sudden and accidental breaking, deforming, burning out or rupturing" of an insured piece of machinery. *Id.* (cleaned up). The SJC found that an auditor had construed the policy too narrowly by concluding that coverage was not available because the damage was "gradual and not sudden," based on the erroneous setting of the condenser springs. *Id.* at 678-79. In analyzing the policy's coverage, the court found that the words "sudden and accidental" "describe a result" (damage to an object) and "do not refer to any means by which that result has been brought about." *Id.* at 679. The court also offered the following observation:

> If we lay to one side any idea of the rapidity or quickness in the actual cracking of the spindle and give to the term sudden its primary meaning according to the lexicographers as a happening *without previous notice or with very brief notice, or as something coming or occurring unexpectedly, unforeseen, or unprepared for,* then the cracking of the spindle comes within this concept of the word, for it is plain from the report of the auditor that the mechanical defect which caused the cracking arose through no fault and even without the negligence of the insured and that the latter had no knowledge of the existence of the defect, much less any reason to anticipate that it would cause damage to the turbine. In fact, no one knew the cause of the damage until after the spindle had been replaced. The damage to the spindle *could not be reasonably anticipated, and its occurrence was unexpected and unforeseen and consequently sudden in the ordinary meaning of the word.*

*Id.* at 680-81 (emphases added). This observation suggests a focus on the foreseeability of an event, rather than its temporal characteristics, in determining whether it can be considered "sudden and accidental." And this plain reading of *New England Gas* would appear to align more closely with Illinois' current interpretation of the "sudden and accidental" exclusion exception, as opposed to that of Massachusetts. Ultimately, what the *New England Gas* court meant in its analysis of the word "sudden" is academic because the case did not resolve the interpretative question of what it means for a cause of damage to be "sudden and accidental." But it is equally apparent that the SJC did not embrace the "temporal element" requirement of the "sudden and accidental" coverage modification that later became the critical holding in *Belleville*.

Thirty-two years after *New England Gas*, the Massachusetts Appeals Court encountered another insurance coverage dispute that turned on the "sudden and accidental" exclusion exception. *Shapiro v. Pub. Srv. Mut. Ins. Co.*, 477 N.E.2d 146 (Mass. App. Ct. 1985), rejected by *Belleville*, 555 N.E.2d at 573. *Shapiro* involved an oil leak from the insured's underground fuel tank which ultimately reached surrounding waterways. *Id.* at 148. The insurer argued that the oil leak was not "sudden" within the meaning of the policy because it was the result of a progressive deterioration of the oil tank on the insured's property. *Id.* at 150. The court disagreed, citing two primary reasons. First, the words "sudden and accidental," according to the Appeals Court were not "free from ambiguity." *Id.* at 149. This, in turn, required the court to resolve the ambiguity in favor of coverage. *Id.* at 149. Second, *Shapiro* rejected the contention that the event that caused the damage had to be a "dramatic catastrophe" in order to qualify as "sudden" under the insurance policy. *Id.* Rather, the court

explained, "the word 'sudden' as used in liability insurance need not be limited to an instantaneous happening." *Id.*, quoting *Allstate Ins. v. Klock Oil Co.*, 73 A.D.2d 486, 488 (N.Y. App. Div. 1980). For those reasons, the court held that the policy in question provided coverage for the insured, notwithstanding the gradual nature of the underlying cause of the damage. *Shapiro*, 477 N.E.2d at 150.

The takeaway from *New England Gas* and *Shapiro* is that the construction of the "sudden and accidental" exclusion exception was, at best, ambiguous and unsettled before 1990, when *Belleville* was decided. This timeline is critical to a proper understanding of the parties' justified expectations when they agreed to the terms in the policies at issue in the late 1970s and early 1980s. Illinois and Massachusetts are in accord with the principle that ambiguities in insurance policies are construed in favor of coverage. *See Metropolitan Prop. & Cas. Ins. Co. v. Morrison*, 951 N.E.2d 662, 671 (Mass. 2011) ("When confronting ambiguous language, we construe the policy in favor of the insured and against the drafter, who is invariably the insurer."); *Outboard*, 607 N.E.2d at 1217 (in Illinois, "[a]mbiguous terms are construed strictly against the drafter of the policy and in favor of coverage."). The relevant policies cover periods from 1975 to 1983. At that time, neither Massachusetts nor Illinois had endorsed the interpretation of the "sudden and accidental" exclusion exception that the Insurers seek to apply here. It is thus highly doubtful that the *current* interpretation of the exclusion exception as articulated in *Belleville* was among the parties' justified expectations. Indeed, two years after the last policy term at issue in this case expired, the Massachusetts Appeals Court held that the "sudden and accidental" exclusion exception was ambiguous and that the damage-causing event need not be "instantaneous"—an apparent rejection of the "temporal element" that *Belleville* later adopted. *Shapiro*, 477 N.E.2d at 150. And with the

ambiguous construction of the words "sudden and accidental" at the time, the parties, if anything, would have expected the ambiguity to be resolved in favor of coverage.

Even if one assumes that the parties' justified expectations incorporated Massachusetts law, the maxim that coverage ambiguities are construed against the insurer has withstood the test of time in Massachusetts. *See Woogmaster v. Liverpool & London Globe Ins. Co.*, 45 N.E.2d 394, 396 (Mass. 1942) ("[I]f the terms of the policy are ambiguous then every doubt is to be resolved against the insurer"). The only logical takeaway from this brief historical overview is that the parties would have expected the "sudden and accidental" exclusion exception to cover damage arising from discharges that were "unexpected, undesigned, and unintended," *New England Gas*, 116 N.E.2d at 679, without regard to their temporal characteristics.

The Insurers have argued that the parties' justified expectations would have favored the application of Massachusetts law because, at the time, the Commonwealth adhered to the rule of *lex loci contractus*—the law of the place of contracting. (Doc. 125 at 18). *Bushkin*, of course, abandoned the *lex loci* rule in favor of the functional approach discussed in this Order. But because *Bushkin* had not been decided at the time, so the Insurers' argument goes, their expectation would have been to apply Massachusetts law. The Court disagrees. *Bushkin* did not simply consider the parties' justified expectations with respect to the question of which state's substantive law to apply. Its discussion was more targeted than that. *Bushkin* addressed the parties' justified expectations with respect to the disputed issue at hand— whether the statute of frauds of New York or Massachusetts applied to an alleged oral contract. *Bushkin*, 473 N.E.2d at 670-71. That means that this Court must consider the parties' justified expectations with respect to the scope of the "sudden and accidental" pollution

exclusion, not simply with respect to the question of which state's law applies more generally.[8]

Here, the application of Illinois law, rather than that of Massachusetts would validate the parties' justified expectations. *Bushkin* treated the validation of the parties' justified expectations as a dispositive tiebreaker after finding that the other choice-influencing factors were balanced. *See id*. at 671 (choosing the law of the state that validates the parties' intention at the time of contracting, rather than the law that would defeat it). Here too, none of the other considerations in Sections 193, 188 and 6 compels the application of either state's law. For this reason, the Court finds that the validation of the parties' justified expectations dispositively tips the scale in favor of the application of Illinois law.

### v.  The remaining Section 6 considerations

The remaining Section 6 considerations do not carry significant weight in this analysis. The basic policies underlying the particular field of law (Section 6(2)(e)) come into play "in situations where the policies of the interested states are largely the same but where there are nevertheless minor differences between their relevant local law rules." Restatement (Second) of Conflict of Laws § 6, cmt. h. This is not such a situation because the policies of Illinois and Massachusetts with respect to the "sudden and accidental" exclusion exception are not "largely the same." Thus, there is no way to harmonize these competing interpretations in this choice of law analysis. *See Lines*, 2008 WL 2908053, at *6 ("These differences in law are the result of different policy approaches to these issues taken by the appellate courts in these

---

[8] Even if the Court accepted the premise that the consideration of the parties' justified expectations focused solely on the question of which state's law governed, and further assuming that the Insurers are correct that the expectation would be for Massachusetts law to apply, the inquiry would lead to the same endpoint. At the time, Massachusetts law did not offer the Insurers the favorable interpretation of the "sudden and accidental" exclusion exception that they seek to apply here.

two states. These fundamental policy differences cannot be bridged or harmonized through the choice of law."). The considerations of certainty, predictability, and uniformity of result (Section 6(2)(f)) are "of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions." Restatement (Second) of Conflict of Laws § 6, cmt. i. Here, it can fairly be said that the Insurers gave advanced thought to the consequences of the language in their policies, but as noted in the discussion on the parties' justified expectations, the application of Illinois law is most likely to validate the considerations at play at the time. As a result, the Court is not persuaded that the application of Illinois law undermines the certainty, predictability, and uniformity that the parties sought to achieve at the time of contracting. Finally, the consideration of the ease in the determination and application of the law to be applied (Section 6(2)(g)) carries very little weight (if any) because it is aspirational rather than substantive. *See id.*, cmt. j ("Ideally, choice-of-law rules should be simple and easy to apply. This policy should not be overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results. The policy does, however, provide a goal for which to strive.").

## Conclusion

For these reasons, the Court concludes that Illinois law governs the interpretation of the insurance policies at issue in this case. The XTRA Entities' Motion on Choice of Law (Doc. 127) is **GRANTED**. The Insurers' Joint Motion on Choice of Law (Doc. 125) is **DENIED**.

**IT IS SO ORDERED.**

**DATED:  March 29, 2024**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**